Filed 5/14/14  Hemaratanatorn v. Pasternak CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ADESORN HEMARATANATORN, | B245701 |
| Cross-Complainant and Appellant, | (Los Angeles County Super. Ct. No. VC056465) |
| MICHAEL HELLYAR, | |
| Cross-Defendant and Appellant, | |
| v. | |
| DAVID J. PASTERNAK, | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Thomas McKnew, Judge.  Affirmed.

The Jamison Law Firm and Guy E. Jamison for Cross-Complainant and Appellant, Adesorn Hemaratanatorn.

Michael J. Allison for Cross-Defendant and Appellant, Michael Hellyar.

David J. Pasternak, in pro. per., for Receiver and Respondent.

_____

In 2010, the marital dissolution action of Michael and Annette Hellyar expanded to include a dispute over the ownership of a corporation, MBE Digital, Inc., a large format digital printing business. In addition to Michael and Annette Hellyar, additional parties became involved, all disputing the ownership of the business. In August 2010, at the request of Adesorn Hemaratanatorn and Michael Hellyar (collectively appellants), the trial court appointed a receiver. In November 2012, the trial court issued an order approving and settling the receiver's final report. The individual parties to the dispute were ordered, jointly and severally, to pay the approved final compensation and reimbursement of costs for the receiver, and compensation and costs of service providers retained by the receiver, in the amount of $626,244.11. Appellants challenge the order. They contend the trial court abused its discretion in ordering them to bear joint and several responsibility for the receiver's compensation and receivership costs. We find no abuse of discretion and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

According to a complaint for joinder Michael Hellyar filed in March 2010, in July 2009, Annette Hellyar (now Leiva) filed a petition for dissolution of her marriage to Michael Hellyar.[1] In the dissolution proceedings, Leiva contended a business, MBE Digital, Inc. (MBE), was a community asset. In the complaint for joinder, Hellyar alleged Leiva held 50 percent of MBE's stock in trust for Hellyar; Cindy Lujan held 25 percent of MBE's stock in trust for Brian Rayner; and Adesorn Hemaratanatorn held 25 percent of MBE's stock, which was issued to him as security for a $530,000 loan to Hellyar. Hellyar asserted MBE was not a community asset, and Leiva had repudiated her agreement to hold shares of MBE solely in trust for Hellyar. Among other claims, Hellyar sought declaratory relief to establish his rights, and those of Leiva, Lujan, Rayner, and Hemaratanatorn, with respect to MBE.

---

[1] As of the last proceedings in the record, Annette Hellyar's name had changed to Annette Leiva. To avoid confusion, we will refer to Annette as "Leiva" for the remainder of the opinion, and to Michael Hellyar, as "Hellyar."

2

In May 2010, Hemaratanatorn filed a cross-complaint against MBE, Rayner, Leiva, Lujan, and Hellyar. Hemaratanatorn alleged Leiva, Rayner, and Lujan breached their fiduciary duties by retiring his shares without reason, taking compensation from MBE for their own benefit, converting MBE's customers and other assets, refusing him and other shareholders access to MBE's books and records, and engaging in conduct contrary to the interests of MBE and its shareholders. Hemaratanatorn further alleged MBE and Hellyar breached their contract with him by failing to make loan payments to him. Hemaratanatorn sought injunctive relief to prevent Leiva, Rayner, and Lujan from compensating themselves with MBE revenue, selling or disposing of MBE's assets, or engaging in other activity that might affect the rights and interests of appellants. He further sought removal of Leiva, Rayner, and Lujan from MBE and an accounting.

In June 2010, appellants filed an ex parte application for the appointment of a receiver for MBE. They filed a supplemental application later the same month. Lujan, Rayner, and Leiva opposed the application. At a July 1, 2010 hearing, the court suggested there could be less drastic alternatives to appointing a receiver. Appellants vigorously argued that significant oversight of MBE was required. At the conclusion of the hearing, the court indicated it was not inclined to appoint a receiver; instead the court suggested it would appoint someone to review the business's books and records. The court asked the parties to submit names for consideration and took the matter under submission.

In August 2010, the trial court issued an order appointing David J. Pasternak as receiver "to conduct an investigation regarding the financial affairs of MBE Digital, Inc. and to file and serve a written report detailing the Receiver's findings within 90 days from the date of this Order. Among other things, the Receiver shall report about the appropriateness of claimed business expenses." The order allowed the receiver to charge his standard hourly billing rate of $495 per hour, and to receive reimbursement of costs. He was authorized to employ the services of accountants and other professionals in connection with his duty. As to payment of the receiver, the court ordered:

"The Receiver shall prepare and serve monthly statements reflecting the Receiver's fees and administrative expenses, including reasonable fees and costs of accountants and attorneys and other professionals authorized by the Court, incurred for each monthly period in the operation and administration of the Receivership estate. Within 10 days after service of each statement, MBE Digital, Inc. shall pay the amount of each statement, subject to further reallocation by this Court. Notwithstanding periodic payment of fees and expenses, all fees and expenses shall be submitted to the Court for its approval and confirmation, in the form of either a [properly] noticed interim request for fees, a stipulation of all parties, or in the Receiver's Final Account and Report."

In December 2010, Hemaratanatorn filed another ex parte application requesting that the court grant the receiver full powers over MBE. Based on declarations from Hellyar and a former MBE employee, Hemaratanatorn asserted Leiva, Rayner, and Lujan were converting MBE's business to a new company, BMR Digital (BMR). Hemaratanatorn further noted MBE had not responded to several of the receiver's requests for documentation. In a letter to MBE's counsel, the receiver had indicated there were significant differences between MBE's records and previously produced tax returns. The former employee declared she heard Rayner and Lujan discussing how they would exclude appellants from the business. She further declared Rayner and Lujan instructed her to transfer MBE's clients to BMR, and she observed MBE's equipment being used by BMR. She additionally reported Lujan and Rayner reimbursed Rayner for many personal expenses, including his rent, and that Leiva was included on MBE's payroll even though she did not appear to perform any work for the company. Hellyar declared MBE's sign had been removed from the business's premises and replaced with a BMR sign, and the website for BMR directed users to the MBE website.

The trial court issued an order granting the receiver full and exclusive power, duty, and authority to administer and manage all of MBE's business affairs. The order authorized and instructed the receiver to take possession of MBE's records, assets, and property. Regarding compensation, the supplemental order again approved the receiver's hourly rate, and ordered him to prepare and serve monthly statements reflecting his fees

4

and administrative expenses. The order further provided: "Upon service of each statement, the Receiver may disburse from Estate funds, if any, the amount of each statement. Notwithstanding periodic payment of fees and expenses, fees and expenses shall be submitted to the Court for its approval and confirmation in the form of either a properly noticed interim request for fees, stipulation of all parties, or Receiver's Final Report and Account." MBE appealed. In an unpublished opinion, this court affirmed the order. (*Hellyar v. MBE Digital, Inc.*, (April 25, 2012, B231107).)

At the end of December 2010, the receiver filed his first interim report for the period ending November 30, 2010. He had posted his bond, filed his oath, and hired forensic accountants. However, the parties had not supplied the information and documents he needed to adequately investigate or report on MBE's financial affairs. The report indicated the receiver intended to pay his bills, subject to the court's future confirmation, when there were sufficient funds in the receivership estate to do so.

In January 2011, the receiver requested an order adding BMR to the receivership. The receiver reported: "MBE has insufficient funds to operate independent of BMR. Despite demand by the receiver, BMR has failed and refused to turn over its receipts directly to the receiver. It appears that significant funds may have been siphoned off through BMR or otherwise. In order for this receivership to operate, or for the forensic investigation to be completed, full access to BMR must be given to the receiver and his forensic accountants. In short, this receivership either should be terminated or should be expanded to include BMR." The trial court granted the request to include BMR in the receivership.

In February 2011, at the receiver's request, the trial court authorized Hellyar to run the receivership business under the receiver's control. In May 2011, the court, in response to an ex parte application filed by the receiver, enjoined Rayner and Lujan from operating any competing large format printing or installation business in California during the pendency of the litigation. The court also added to the receivership iMS International and any other competing businesses affiliated with Rayner and Lujan. The court issued accompanying facilitating orders, such as an order to the Los Angeles

5

County Sheriff's Department to assist the receiver in entering and seizing property relating to MBE, BMR, iMS International, and any other affiliated businesses, from various addresses. The court later authorized the receiver to consolidate the operations of MBE, BMR, and iMS International.

In a declaration filed with the court in May 2011, the receiver declared that while Rayner and Lujan were operating MBE and BMR, they did not cooperate with his attempts to enforce the receivership orders. After he removed them from the receivership business, they formed and operated a competing business, thereby diverting many clients from the receivership business. When the receiver had the competing business added to the receivership, Rayner and Lujan established a third competing business, using MBE and BMR employees, and providing services to clients they had diverted. One of the receiver's employees declared that when she took control of iMS International, she discovered equipment necessary to operate a large format printing and installation business, client lists that included former MBE clients, and a camera that had disappeared from the MBE/BMR offices.

The receiver filed an application for an order to show cause regarding contempt against Rayner and a third party.[2] In his third interim report, filed in July 2011, the receiver recounted his efforts to enforce the receivership orders. The receiver reported that when he and Hellyar went to the receivership business in February 2011, Rayner instructed "two taser-armed guards to prevent the receiver from entering the business. [Rayner] and Ms. Lujan proceeded to attempt to physically attack Mr. Hellyar, and had to be restrained by the receiver's security personnel and two police officers who were called to the scene." The receiver further reported that after Rayner and Lujan left the business, the receiver's staff discovered the MBE computers had been tampered with, which prevented the business from operating the next day. A printer Rayner and Lujan left at

---

[2]      In August 2011, the trial court found Rayner guilty on three contempt counts. The court ordered Rayner to pay $3,000 in contempt fines, and the receiver's attorney fees and costs incurred in the contempt proceeding, totaling $45,000. According to the receiver's final report, Rayner never paid any portion of the assessed fines and fees.

6

the business premises never functioned after their departure. The receiver also reported problems with MBE's liability and umbrella insurance policy, which Rayner and Lujan had converted to cover BMR in late 2010. The receiver discovered MBE had no current worker's compensation coverage.

The receiver reported that due to the pre-receivership operation of the receivership business, and the diversion of business and funds from the receivership business, MBE was in significant debt. Although MBE's business was improving, the receiver had not been able to significantly reduce the company's financial obligations, even though BMR had incurred most of the pre-existing debt. These obligations, and the operations of the businesses prior to the receivership, had generated multiple lawsuits. The receiver was now defending and attempting to resolve these suits. The receivership's unpaid fees and costs at that point exceeded $250,000; he had also retained other professionals whose unpaid fees and costs totaled over $44,000. The receiver explained: "Because of the lack of available funds in this receivership estate, none of the receivership costs of administration have been paid to date. Pursuant to this court's orders, the receiver intends to pay the attached billing statements subject to this court's future confirmation to the extent that there are ever sufficient funds in this receivership estate to do so. [¶] This has been an expensive receivership estate because of the lack of cooperation by Rayner, Ms. Lujan and their cohorts, and the repeated violations of this court's receivership orders."

In or around August 2011, Rayner and Lujan moved to terminate the receivership or, alternatively, for an order allowing MBE to file for bankruptcy protection.[3] The receiver opposed the motion, arguing Rayner and Lujan were attempting to circumvent the receiver's efforts to rebuild MBE and undo the damage Rayner and Lujan had themselves done to the company. The receiver noted Rayner and Lujan complained about the receiver's fees and costs but failed to note that their actions had caused greater

---

[3]     It is unclear when the motion was first filed. The record does not include a copy of the motion, only an August 17, 2011 notice continuing the hearing on the motion. The record also does not include a formal ruling on the motion.

7

costs than might have been otherwise.  Hellyar joined the receiver's opposition.

In response to the receiver's fifth interim report for August 2011, Rayner and Lujan continued to argue the receivership should be terminated because the business had "become nothing but a shadow of its former self, losing hundreds of thousands of dollars and running up debts that it will never be able to pay."

In October 2011, the receiver filed a liabilities report, setting forth the liabilities against the receivership estate and an analysis of expected future business revenue.  The report indicated Lujan and Rayner's records showed their mismanagement of company assets; neither MBE nor BMR was profitable, even before the receivership; and Lujan and Rayner's records failed to account for large tax and assessment payments owed to state agencies.  However, the receiver concluded the company continued to operate and business had increased under Hellyar's management.  The receiver expected that with additional time, the business could "look forward to being able to be operated in a sound financial fashion . . . ."

In November 2011, Lujan and Rayner filed another motion to terminate the receivership and for an order directing the receiver to file bankruptcy petitions on behalf of MBE and BMR.  They also sought termination of the injunction barring them from competing with the receivership businesses.  Lujan and Rayner asserted MBE's losses continued to grow and it was unlikely the business would generate enough profit to reduce its debt.  They argued there was therefore no reason to continue the receivership.

Appellants jointly opposed the motion as to MBE.  They did not object to the termination of the receivership of BMR, or for an order directing the receiver to file bankruptcy for BMR.  However, with respect to MBE, they asserted the business was a profitable and viable company.  The opposition noted Hemaratanatorn had invested significant sums in MBE, and had recently purchased large printing machines so that MBE could continue its operations.  Appellants noted: "While it is true that the receivership is a financial burden on the business of MBE, such a situation is not entirely uncommon with receivership.  If the Receiver is able to effectively continual [*sic*] the management of MBE so that it may be profitable and able to slowly satisfy its

liabilities, . . . MBE should be able to recover from the egregious wrongs committed by Cross-Defendants Brian Rayner and Cindy Lujan."

The receiver supported the motion to terminate the receivership. He informed the court he supported the motion "because [he] had received no compensation or reimbursement of costs for [his] services in this matter, and the considerable time and expenses were taking a significant financial toll on [him] and [his] office."[4] The trial court denied the motion to terminate the receivership.

In mid-December 2011, the receiver filed his sixth interim report. His fees and costs totaled $417,073.85; the unpaid fees and costs of third parties he hired were an additional $90,498.48. As in previous reports, the receiver informed the court that none of the receivership costs of administration had been paid due to the lack of funds in the receivership estate. But the report added: "However, the Receiver can not continue to serve in this matter any longer unless the parties provide for the payment of the receivership's substantial unpaid costs of administration. [¶] As previously reported, this has been an expensive receivership in large part because of the lack of cooperation by Rayner, Ms. Lujan and their cohorts, and the violations of this Court's receivership Orders." In late December 2011, the receiver filed a seventh interim report. In addition to repeating the statement that the receiver could not continue to serve without payment, he informed the court: "This matter is scheduled for trial in early February, 2012, and the Receiver expects this receivership to terminate immediately thereafter, and will ask the court to hold all of the individual parties jointly and severally responsible for the unpaid receivership costs of administration."

In early February 2012, the court conducted a bench trial on the equitable claims at issue. In early April 2012, the court issued an order regarding termination of the receivership. Under the order, upon payment of $250,000 to the receiver, the receiver was to turn over custody, possession, and control of the receivership business to

---

**4** No formal response from the receiver is included in the record, nor is there a transcript from any hearing on the motion. However, the receiver summarized his position in the subsequent final report and accounting.

appellants. The funds were to be used to first resolve payroll tax claims against MBE, and, second, to pay a portion of the unpaid receivership costs of administration. The receiver was to file and serve his final report and account within 60 days after turning over the business.

In late April 2012, the court issued a statement of decision regarding the equitable claims. Among other findings, the court concluded Leiva held MBE shares in trust for Hellyar; Hemaratanatorn acquired and still owned 100 shares of MBE stock; the shares were not collateral for money he loaned MBE; and Hellyar was to retain possession and control of MBE for the benefit of its shareholders. The court determined the receiver's obligations would conclude upon the court's approval of the receiver's final report and accounting. The statement of decision indicated: "The court shall approve any reasonable fees and costs remaining due and owing to the receiver and his retained accountant." The court additionally noted: "The receiver's and accountant's fees are substantial. The court was not asked to determine whether MBE shall be liquidated due to alleged insolvency or determine the amount of debt it may owe to [Hemaratanatorn], vendors, employees, if any, and other creditors. [¶] Whether or not MBE will be forced into bankruptcy or reorganization is not before the court. Based upon its findings, the court's decision is to prevent Rayner and Lujan from mismanaging MBE for their own self-interest, including looting the business of monies and physical assets and directly or indirectly competing with MBE for a reasonable time. [¶] To the extent that bad faith is alleged by Hellyar on one hand and Rayner and Lujan on the other, the court finds that Rayner and Lujan have acted in bad faith during all relevant times."

In May 2012, the receiver filed an eleventh interim report.[5] The receiver explained the $250,000 payment was not made in March 2012 as ordered, thus the

---

[5] The receiver filed his eighth report in February 2012, and his ninth and tenth reports in March 2012. These reports indicated that in December 2011, the receiver had supported Rayner's motion to terminate the receivership, and that the court denied the motion but stated it would not continue the trial and would reconsider the termination motion following the conclusion of the trial. These reports also reiterated that the

10

receivership had continued that month. In July 2012, MBE, through Hellyar, filed a voluntary Chapter 11 bankruptcy petition, without the receiver's knowledge.

In September 2012, the receiver filed a final report and accounting. The receiver identified his total unpaid fees and costs as over $535,000. In addition, forensic accountant fees, security fees and costs, and forensic computer consultant fees and costs totaled over $90,000. The receiver asked the court to order all individual parties jointly and severally responsible for payment of the unpaid receivership costs of administration "because all of them are or claimed to be owners of the receivership business, and this receivership thereby operated that business for their benefit during this receivership. This request is not a surprise because I have repeatedly stated my intention to make this request in my previously filed and served interim reports."

Appellants opposed the final report. Hellyar argued the receiver's costs should be paid out of the funds of the receivership and, while they were not available because of the bankruptcy petition, the funds had not yet been determined to be insufficient to pay the receiver. Hellyar further asserted the conduct of Rayner and Lujan made the receivership necessary, and it would be unfair to hold appellants responsible for the receiver's costs. Hemaratanatorn similarly argued the receiver should not be able to avoid filing a claim in the bankruptcy proceeding. He also contended the appointment of a receiver was proper due to Rayner and Lujan's conduct, thus appellants should not be held accountable for the receivership costs. Hemaratanatorn took issue with some of the receiver's actions, asserting the receiver's services "may have in actuality hurt the business of MBE to almost the same degree, if not worse, than defendants [Leiva, Rayner, and Lujan]."

---

receiver was having difficulty continuing to serve without payment, and that he intended to ask the court to hold all of the parties jointly and severally responsible for the unpaid receivership costs.

Hemaratanatorn further asserted he had never operated or managed MBE, had no ownership interest in BMR, and was "truly an innocent party."**6**

In response, the receiver argued it was equitable to hold appellants equally responsible for the receivership costs because they were in a better position than he or the court to understand the potential assets, liabilities, and business prospects of MBE, before the receivership. The receiver also noted he kept all parties informed of the receivership costs as they grew and the receivership business's inability to pay those costs. He asserted appellants repeatedly fought to keep the receiver in place, despite the costs and the receivership's inability to cover the costs. He additional argued: "Hellyar has now – unilaterally and without any notice to this Court or the Receiver—filed Chapter 11 proceedings in order to wrest control of the receivership business from the Receiver, thereby avoiding payment of any of the receivership fees and costs and obtaining control of that business for himself and Hemaratanatorn."

The receiver argued it would be "highly inequitable" to force him to seek relief in bankruptcy court because the time, effort and costs would be significant and not recoverable by the receiver; any award of fees or costs could take years to distribute, and he had already gone unpaid since the beginning of the receivership; and: "as this Court and all parties are aware, any attempt by the Receiver to fully recover what he is due from the Company will be fruitless because there are nowhere near sufficient funds (and probably no business fund), nor have there ever been." The receiver asserted the more equitable course was joint and several liability of all of the parties for the receivership costs, along with an order assigning "any claim [the receiver] has against Debtor jointly and severally to [the] individual parties, who can then pursue those claims themselves if they believe they have any value."

---

**6** The State Board of Equalization also filed an objection to the receiver's final report on the ground that the receiver had failed to file sales tax returns and pay the sales tax liability of MBE.

12

In November 2012, the trial court approved the receiver's final report and account. The court ordered payment of all of the receiver's outstanding fees and costs, and the fees and costs of the forensic accountants, forensic computer consultants, and security company the receiver had retained. The court ordered Leiva, Hellyar, Lujan, Rayner, and Hemaratanatorn, jointly and severally, to pay the final compensation and reimbursement of costs, totaling $626,244.11. The court assigned to the individual parties jointly and severally any and all claims the receiver held against MBE, now a debtor in bankruptcy.

Appellants timely appealed.

## DISCUSSION

**The Trial Court Did Not Abuse its Discretion in Holding Appellants Jointly and Severally Responsible for the Receiver's Costs and Fees**

Appellants' sole contention on appeal is that the trial court erred in holding them jointly and severally responsible for the receiver's costs and fees. We find no abuse of discretion.

"A receiver is an agent and officer of the court, and is under the control and supervision of the court. (Code Civ. Proc., § 568; Cal. Rules of Court, rule 3.1179.) The receiver is also a fiduciary who must act for the benefit of all parties interested in the property. [Citation.] [¶] Receivers are entitled to compensation for their own services and the services performed by their attorneys. [Citation.] . . . . Courts are vested with broad discretion in determining who is to pay the expenses of a receivership, and the court's determination must be upheld in the absence of a clear showing of an abuse of discretion. [Citations.]" (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685-686 (*City of Chula Vista*).)

"A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited . . . . Rather, it must be exercised within the confines of the applicable legal principles. [¶] 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no

13

reasonable basis for the action is shown.' [Citations.] 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action. . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] . . . [¶] The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred.' [Citation.] To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

The legal principles and policies regarding the payment of receivership expenses are well established. "Generally, the costs of a receivership are paid from the property in the receivership estate. [Citations.] However, courts may also impose the receiver costs on a party who sought the appointment of the receiver or ' "apportion them among the parties, depending upon circumstances." ' [Citation.] . . . . [¶] . . . [¶] A court may require one or more parties to pay for receiver fees where the property subject to the receivership is inadequate to compensate the receiver and/or where other equitable circumstances support imposing fees on a party. [Citations.] In considering the appropriate source for the compensation, a relevant factor is whether the party to be charged obtained a benefit from the receiver's services. [Citation.]" (*City of Chula Vista, supra,* 207 Cal.App.4th at pp. 685-686.)

In this case, the receiver repeatedly informed the court the receivership property was inadequate to compensate him or his retained consultants. The record also indicated appellants received a benefit from the receiver's services. At the outset of the proceedings, and immediately after the receivership began, it appeared that Rayner and Lujan were intent on looting MBE for their own personal gain, by diverting the company's assets to BMR, in which appellants had no ownership interest. The receiver prevented this from happening. Because of the receiver's investigation and recommendation, Rayner and Lujan were removed from managing the company,

14

prevented from competing with it, and Hellyar was placed in charge under the receiver's control. Further, while the receiver was unable to restore the business to profitability, he successfully interrupted the damage to operations and destruction of goodwill occurring under Rayner's and Lujan's management. This benefitted appellants.

Thus, the trial court's decision to hold the individual parties, including appellants, responsible for the receiver's fees and costs, is supported by California case law. In *Andrade v. Andrade* (1932) 216 Cal. 108, 110, the California Supreme Court explained that "[a]s a general proposition the costs of a receivership are primarily a charge upon the property in the receiver's possession and are to be paid out of said property. However, this is not an invariable rule. In many cases a direct liability is imposed upon the parties to the action, or upon some of them, for the remuneration of the receiver. Such direct liability may result from an irregularity in the appointment, insufficiency of the property, agreement of the parties, etc." The court cited an earlier California Supreme Court opinion, *Ephraim v. Pacific Bank* (1900) 129 Cal. 589 (*Ephraim*), in which the court stated the same proposition.

*Ephraim* concerned a property dispute. The plaintiffs, the Pacific Bank and its trustees and directors, sued Madera Fruit and Land Company with respect to certain "lands and premises." At the plaintiffs' request, the court appointed a receiver. However, prior to the plaintiffs' commencement of the action, another bank had initiated foreclosure proceedings based on a mortgage it held on the contested property. The foreclosing bank obtained a judgment of foreclosure and sale, and subsequently purchased the property. The plaintiffs dismissed their suit. Sometime later, the court settled and approved the receiver's account. Although the plaintiff Pacific Bank had been declared insolvent, its trustees and directors still had custody and control of the bank's funds and assets. The receiver filed a claim against Pacific Bank and its trustees and directors to recover the costs of the receivership. (*Ephraim, supra,* at pp. 590-591.)

The plaintiffs argued that since the receiver had not collected his fees out of the property, he had no right to collect against the parties to the original suit. The *Ephraim* court rejected this argument, explaining: "It is unquestionably the general rule that the

15

costs of a receivership are primarily a charge upon the fund in his possession, and are to be paid out of that fund. But it is by no means the rule that a receiver must in all cases look to that fund for his reimbursement, and has no other remedy if for any reason that fund is not available." (*Ephraim, supra,* at p. 592.) Citing a treatise, the court continued: " 'But it may sometimes happen that a direct liability is imposed upon the parties to the action, or upon some of them, for the remuneration of the receiver. This may result from the irregularity of the appointment, or from the insufficiency of the fund, or out of the agreement between the parties.' " (*Ibid.*)

In *Ephraim*, because of the preexisting lien and mortgage on the property, the mortgagee was entitled to full payment of the foreclosure judgment out of the proceeds of the sale of the property, and "the right of the receiver attached only to the surplus. If there should be no surplus, there was an 'insufficiency of the fund,' which authorized [the receiver] to look to the parties in the action for his remuneration." (*Ephraim, supra,* at p. 593.) The receiver was authorized to seek payment for the receivership costs and fees from Pacific Bank, and the trustees and directors of the bank who had initiated the suit and sought the appointment of a receiver. (*Id.* at p. 595.) We acknowledge the *Ephraim* court also suggested the receiver could properly seek remuneration from the plaintiffs because the foreclosing bank's rights to the property rendered the receiver's appointment unauthorized. (*Id*. at p. 592.) It is undisputed that the receiver's appointment in this case was authorized. However, we still find applicable the principle set forth in *Ephraim*, namely that the receiver is entitled to be compensated for his or her services and reimbursed for expenses, and when the receivership fund is insufficient, there are circumstances in which it is equitable and appropriate for the court to allow the receiver to seek payment from the parties who benefitted from the appointment. (*Id.* at pp. 593-594.)

16

Here, due to the insufficiency of the fund and the attendant circumstances, the trial court could reasonably hold appellants liable for the receiver's costs.[7]  Appellants not only requested the receivership, they opposed its termination, even after the receiver filed reports describing the dire financial situation of the business, and in the face of the receiver's eventual support for an order terminating the receivership.  Appellants did not object to the receiver's continued service or criticize his performance until he filed his final report.  Although in their opposition to the final report, and again on appeal, appellants faulted the receiver for defending lawsuits against BMR, or for having unpaid sales taxes and assessments, the receiver had alerted the parties to these issues much earlier.

For example, in the receiver's October 2011 liabilities report, he identified significant Board of Equalization assessments for periods before and during the receivership.  Despite this and other significant liabilities identified in the report, in December 2011, appellants opposed a motion to terminate the receivership, arguing the business could be profitable, and the receiver had provided adequate reporting.  Indeed, they asserted: "The Receiver's last report filed on October 5, 2011 could not be any clearer in describing the Receivership estate and the status of the business."  And, even after the receiver began notifying the parties and the court that he would seek remuneration from the parties, appellants did not object to the interim reports, or assert the receiver was "running MBE into the ground," until the receiver sought to settle the account.

---

[7]  Of course appellants alone are not responsible for the fees; Lujan, Rayner, and Leiva are equally responsible.  Appellants contend that to the extent the court was to hold individual parties liable for the costs of the receivership, the court should have required only Lujan and Rayner to pay.  It is true that the court, in its discretion, may require payment from the parties whose conduct necessitated the receivership.  (*Luchs v. Ormsby* (1959) 171 Cal.App.2d 377, 389.)  However, the court is not required to do so, and may apportion receivership costs in a different manner.  (*Baldwin v. Baldwin* (1947) 82 Cal.App.2d 851, 856.)

17

Moreover, beginning in February 2011, Hellyar was managing the business under the receiver's control. The trial court could reasonably conclude Hellyar was well acquainted with the receivership business's affairs. Hellyar twice opposed termination of the receivership *after* he was authorized to run the receivership business. Although the record does not reveal the level of Hemaratanatorn's involvement in or familiarity with the business's operations, the court could reasonably conclude that given his alignment with Hellyar, he too was informed to some degree about the state of the business, beyond the information contained in the receiver's reports.[8] In addition, while in opposing the motion to terminate the receivership appellants at one point argued the receiver had suggested a willingness to allow MBE to pay the receivership costs on a payment plan, Hellyar subsequently unilaterally placed MBE in bankruptcy, rendering any payment from the receivership business impossible without resort to proceedings in bankruptcy court.[9] Under the totality of circumstances, the trial court could hold appellants responsible for the receivership costs, within the confines of California law.

We disagree that *Atlantic Trust Co. v. Chapman* (1908) 208 U.S. 360 (*Atlantic Trust*), mandates a different result in this case. In *Atlantic Trust*, the high court concluded the lower court erred in holding the party who requested a receiver responsible for the receiver's fees solely because the receivership property was insufficient to cover the expenses of the receivership.[10] (*Id.* at pp. 375-376.) However, the court also

---

[8]    In addition to Hellyar and Hemaratanatorn's alignment and cooperation in the litigation, Hellyar testified that Hemaratanatorn had loaned him money for other business ventures; Hemaratanatorn also loaned Hellyar money to use as a down payment on a house.

[9]    This act violated the court's second order appointing a receiver which provided: "No one other than the Receiver has authority to file any voluntary bankruptcy petition on behalf of MBE." When Hellyar filed the bankruptcy petition, the receivership had not yet terminated, due to the failure of any party to make the required $250,000 payment.

[10]    *Atlantic Trust* was not necessarily applying California law. The case was decided in 1908, well before the court's decision in *Erie R.R. v. Tompkins* (1938) 304 U.S. 64,

18

acknowledged the "rule that cases *may* arise in which, because of their special circumstances, it is equitable to require the parties, at whose instance a receiver of property was appointed, to meet the expenses of the receivership, when the fund in court is ascertained to be insufficient for that purpose." (*Id.* at p. 375, italics added.) In *Baldwin v. Baldwin*, *supra,* 82 Cal.App.2d 851, the court explained a fundamental principle regarding receivership costs under California law: "Each case of this kind must, of necessity, rest upon its own facts . . . . 'Courts generally are vested with large discretion in determining who shall pay the cost and expenses of receiverships. The court may assess the costs of a receivership against the fund or property in receivership or against the applicant for the receivership, or it may apportion them among the parties, depending upon the circumstances.' " (*Id.* at p. 856.)

---

and the development of the "Erie doctrine," which established that a federal court sitting in diversity jurisdiction will apply the substantive law of the relevant state. (See 19 Wright, Miller & Cooper, Fed. Prac. & Proc. (2d. ed. 1996) Jurisdiction, § 4502, p. 7 [before *Erie*, and under *Swift v. Tyson* (1842) 41 U.S. 1, "decisions of state courts on matters of commercial law . . . could be disregarded by the federal courts in favor of the general principles and doctrines of commercial jurisprudence. In effect, the *Swift* decision gave the federal courts great freedom to develop uniform principles of substantive law in areas neither covered by state statutes nor involving real estate or similarly 'local' matters."].) Thus, while the *Atlantic Trust* case was appealed from the Ninth Circuit, and the court cited (and distinguished) *Ephraim*, the court also relied on state cases from several other jurisdictions, including Minnesota, North Dakota, and Oregon. (*Atlantic Trust*, at pp. 373-374, 376.) This does not render *Atlantic Trust* necessarily inapplicable, as many other cases from the period, including California cases, cited authorities from other states, and the underlying principles remain relevant today. However, we disagree with appellants' implication that *Atlantic Trust* is binding precedent in a California court. *Atlantic Trust*'s utility is as a potentially persuasive, not binding, authority. (See *Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 770 [decisions of federal courts in matters of state law are not binding on state courts, but may be persuasive]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1126 [decision by U.S. Supreme Court based solely on federal law is not binding on a California court's interpretation of state law].)

19

We also find persuasive the reasoning of the court in *Bowersock Mills & Power Co. v. Joyce* (8th Cir. 1939) 101 F.2d 1000, which involved circumstances similar to those here. In *Bowersock*, the appellant cross-complained against a broker in a business dispute. The broker had agreed to distribute the appellant's products in multiple states. The appellant sought a receiver to recover its products in the broker's possession or control, and to prevent the disposition of the products in a way that would injure the appellant's business. (*Id.* at p. 1001.) The court appointed a receiver. Eventually it became apparent that the expense of recovering and assembling the appellant's products was "out of proportion to their value," but the appellant wished the receiver to continue anyway. (*Ibid.*) Eventually the parties settled the matter. The receiver filed a final report. The receiver's requested compensation exceeded the monies in the receivership fund. The court ordered the appellant to pay the receiver's compensation. (*Id.* at p. 1002.)

The appellant argued the receivership expenses were chargeable only against receivership funds. The Court of Appeals disagreed. Although the court acknowledged the general rule that a receiver's expenses and compensation are to be charged only against the receivership fund and not against the party who procured the receiver's appointment, it also explained that "[e]quitable considerations have created exceptions to these general rules, and it is recognized that there is a discretion in the court appointing the receiver as to who shall be charged with the costs of the receivership." (*Bowersock, supra,* at pp. 1002-1003, fn. omitted.) The court noted the appellant sought the receiver's appointment, the receivership was created for the appellant's benefit and protection, and the intention of the appellant and the court was that the receivership would continue until the underlying controversy was tried and resolved. The court continued: "There is nothing in the record to suggest that the receivership was not conducted in accordance with the wishes of the appellant, and nothing to show that, at any time, the appellant suggested a termination of the receivership, although it must have known that the expense of recovering this widely scattered and deteriorated merchandise would be out of proportion to its value." (*Id.* at pp. 1003-1004.)

20

The court thus concluded: "Because the court, in creating this temporary receivership, did exactly what the appellant asked it to do, and did it for the sole benefit of the appellant and to protect its business and good will, and because the appellant had as much knowledge as anyone about the value of these deteriorated products which the receiver was to collect and dispose of, we have, with some hesitation, reached the conclusion that the order complained of should be sustained in so far as it requires the appellant to pay the allowances made to the receiver and his attorney in excess of the balance of the receivership fund." (*Bowersock*, *supra*, at p. 1004.)

The facts here are analogous, and we find no clear abuse of discretion in the trial court's ruling holding the individual parties jointly and severally liable for the receiver's fees and costs. The fund was insufficient to satisfy the receivership expenses. Appellants sought the receivership in the first instance and repeatedly argued against its termination, even when it was apparent the receivership business had significant debts and liabilities. The receivership inured to their benefit because the receiver managed to halt Rayner's and Lujan's waste and looting of the business's assets. As of February 2011, Hellyar was managing the business under the receiver's control; the trial court could reasonably conclude he, and Hemaratanatorn who was closely aligned with him, knew as much as anyone about the business's financial standing and prospects.

In addition, the record completely fails to support appellants' contention, voiced strenuously at oral argument in this case, that the receiver's performance or conduct in operating the receivership was in any way improper, or that he was derelict in his duties as an officer of the court. As noted above, appellants had no complaints about the receiver's performance until he filed his final report with the court, which sought to hold all of the parties jointly and severally liable for the receivership fees and costs. Only then did Hemaratanatorn criticize some of the receiver's actions, despite previously praising the receiver's performance. The record indicates the trial court could reasonably accept the receiver's analysis and rationale for taking certain actions, such as defending against

21

lawsuits against BMR.[11]  Appellants now fault the receiver for failing to seek to terminate the receivership earlier, or for failing to request guarantees for payment. Yet this argument ignores that in December 2011, approximately one year after Hemaratanatorn successfully asked the court to expand the receiver's powers, and over eight months before the final report, the receiver supported Rayner's motion to terminate the receivership; the same month he explicitly stated in an interim report that he could no longer continue to serve unless the parties provided for payment of the receivership's "substantial unpaid costs of administration"; and later that month he informed all parties he intended to ask that the individuals be held jointly and severally responsible for the receivership fees and costs.  We reject appellants' contention that, in balancing the equities, the court erred in failing to consider alleged deficient performance on the part of the receiver.

We are not unsympathetic to appellants' arguments that it would have been equitable to require only the other parties to pay the receivership expenses.  However, that the court could have assessed the receivership costs differently does not mean the option it chose was an abuse of discretion.  "We could . . . disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable exercise of its discretion, we are not free to substitute our discretion for that of the trial court."  (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881-882.)  For the reasons explained above, the trial court's decision to include appellants as parties liable for the receiver's costs and fees was in line with established relevant legal principles.  (*Horsford v. Board of Trustees*

___

[11]     At the hearing on the final report, the receiver explained the argument that he should not receive fees for defending against lawsuits against BMR, "disregards the nature of the entities and their business, and I don't think anybody in this courtroom can legitimately dispute that BMR and MBE were the alter ego of one another."  The receiver stated BMR and MBE were one and the same, and anyone "who obtained a judgment from BMR would not have required a great deal of work or effort to add MBE and its assets to that judgment."  Aside from the argument regarding fees for work on BMR, appellants declined to offer any specific arguments challenging the reasonableness of the receiver's fees, despite the trial court's indication that it would entertain such arguments in detail.

22

*of California State University* (2005) 132 Cal.App.4th 359, 393-394.) We find no abuse of discretion.

## DISPOSITION

The trial court order is affirmed. Respondent to recover his costs on appeal.


BIGELOW, P. J.

We concur:



FLIER, J.



GRIMES, J.